[THE STATE *ex rel.* BAIRD v. HOLLADAY, *State Auditor.*

1. **Construction of Constitutions.** In general, constitutions, like statutes, are to be construed as prospective only, but when a contrary intent is plainly apparent from the words employed, a different construction will prevail.

2. **Normal School Appropriations:** ESTOPPEL: SEC. 19, ART. 10, CONSTITUTION OF 1875, abrogated the continuing appropriations for the State Normal Schools made by the act of 1875, (Sess. Acts, p. 78). In January, 1877, without any law authorizing it, the Normal School at Kirksville, drew from the State treasury $5,000, the amount to which it had been entitled under the act of 1875. In the following April the Legislature appropriated $7,500 for the school, for the fiscal year 1877. In mandamus proceedings by the Treasurer of the school to compel the State Auditor to draw a warrant on the State Treasury for the full amount appropriated by the latter act; .*Held,* 1st, That the relator was estopped to deny the legality of the payment made to him in January; 2nd, That that payment was to be applied upon the appropriation for the year, and the relator was entitled only to a warrant for $2,500.

*Petition for Mandamus.*

*John F. Williams and Jas. Ellison* for relator.

A payment made on a illegal demand cannot be afterwards applied to a legal demand. *Treadwell v. Moore,* 34 Me. 115. Respondent's return does not allege that the $5,000 paid January 1st, 1877, was paid on the appropriation of April 6th, 1877, but says that by reason of that payment he will rebate from the appropriation of April 6th. The Legislature on April 6th, 1877, set apart $7,500, then in the treasury, or to be in it, for the Normal School. That appropriation certainly did not appropriate out of money that had been paid out three months before. An appropriation is the setting apart of a specific amount for a specific purpose.

*Thomas Holladay pro se.*

The appropriation act of April, 1877, was made for

the fiscal year of 1877, commencing 1st January and ending December 31st, 1877, and hence it relates back to January 1st, 1877, and although the warrant for the $5,000 was drawn in January for the first six months of the year on the proper requisition and demand of the officers of said Normal District, it must go as a credit on said appropriation, and the relator, inasmuch as he got the money and used it for said Normal School, is estopped from gainsaying the transaction on the ground of irregularity, or otherwise.

SHERWOOD, C. J.—The object sought to be accomplished by the present writ is to compel respondent to pay to relator, as treasurer of the Normal School at Kirksville, certain money, alleged to be due under appropriations made by the Legislature.

The demurrer to the Auditor's return, admits the truth thereof. It is admitted thereby, that under the act of April 6th, 1877, the relator is entitled to the sum of $7,500, for the year 1877; that under the act of March, 1873, relator was authorized to present to respondent, every six months, (January and July,) his claim for $5,000, and receive a warrant therefor; but the last named act was abrogated by the adoption of the new Constitution, November 30th, 1875; that relator did, in January, 1877, present to respondent his claim for $5,000, which was duly audited, and a warrant therefor issued; that there then remained still due to relator, for the fiscal year 1877, under the act of April 6th of that year, the sum of $2,500; that since the passage of that act, relator had made a demand of $3,750, which respondent refused to audit, because, with the $5,000 previously paid, the sum demanded would exceed the amount due relator under the act of 1877, in the sum of $1,250. Respondent concludes by averring his willingness to draw his warrant in favor of relator for $2,500, being the balance due under the act of April, 1877.

In the case of the *St. Joseph Board of Public Schools v.*

*Patten et al.,* (62 Mo. 444,) we had under discussion, the effect produced by the new Constitution in respect to two acts of the Legislature, one of date March 3rd, 1866, the other March 20th, 1872, requiring the county court of Buchanan county, upon annual estimates furnished by that board, to levy a tax, not exceeding seven mills on the dollar, to meet such estimates. The county court being furnished with such estimates for 1876, refused to obey the legislative mandate, and levy a tax as high as seven mills, but levied one for four mills only, and we upheld that court in its action, and refused to compel a tax-levy to the extent claimed by the relator, and allowed by the statute; holding that the present constitution having gone into effect on the 30th of the preceding November, became, so far as concerned the point then under discussion, immediately and not prospectively, operative; needed no legislation in its aid; extinguished the legislative limit and measure of taxation, and substituted in lieu thereof, that ordained by the organic law. And this ruling was made, notwithstanding it was strenuously insisted that as there was a proviso which allowed the constitutional rate of taxation to be increased, which could not be accomplished but by subsequent legislation, that, therefore, both restriction against, and proviso for, an increased rate, had alike to invoke and to await subsequent ancillary legislation.

To such argument this court replied that the effect thereof would be to make the constitutional provision there mentioned, as well as others, "mere abstractions, mere declarations of opinion of the convention which framed the constitution, * * effecting no constitutional barriers against legislative extravagance, or constitutional assurances of retrenchment in public expenditures, and taxation consequent thereon;" and that " any construction which makes these constitutional restrictions dependent on legislative action destroys their vitality," and renders them "lifeless." That case affords a very marked instance of an organic law, not operating on the future alone; not being

merely of prospective operation, but springing into efficient being on the instant of its adoption, overturning and hurling from its pathway, every antecedent inconsistent statute.    Unless it can be successfully shown that the rule asserted in the Patten case rests upon a different foundation than that presented by the facts in this one; unless, in short, it can be distinctly demonstrated that the constitution makers intended that instrument to be effective, self-executive, and immediately operative as to funds to be raised for school board purposes, but dormant, inert, powerless and lifeless, as to matters of antecedent appropriations; unless, I say, this can be done, then, while the Patten case stands for law, this one must stand with it.    And it would not be uninteresting to witness the ingenuity capable to trace, between the two cases, the line of demarcation, and the singular acuteness which could afford a reason for the fine-spun distinction.

In the case of *The State ex rel. v. Macon County Court*, (41 Mo. 453,) to which attention has been called, although it was held that in general, constitutions, like statutes, were to be construed as prospective only, yet it was freely conceded that this rule was not universal in its application; but that when a contrary intent was plainly apparent, from the words employed, a different construction should prevail.    And this canon of construction is conspicuously consonant to common sense and sound reason; any other doctrine would place an absolute interdict upon the framers of organic law, by precluding them from the immediate abrogation of existing abuses or the immediate establishment of necessary reforms; would leave the correction of such abuses, or the creation of such reforms to the tardy processes of slow-paced, incompetent, and very often hostile legislation.    And we regard the language employed in section 19 of article 10 of the constitution, that "no moneys shall ever be paid out of the treasury of this State, *    *    except in pursuance of an appropriation by law; nor unless such payment shall be made, or a war

rant shall have issued therefor, within two years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix the sum or object," as plainly evincive of intention, by the members of the convention, to have that section become operative at once. This was the view we entertained of the matter in the case of *The State, &c. v. The State Auditor*, (64 Mo. 526,) a conclusion reached after full discussion.

But in addition to reasons therein set forth, there have occurred the following: It is obvious that the section above cited refers to two classes of appropriation acts; a law making new appropriation; a law continuing or reviving an old one. Now, if it be true that the section under consideration, is to operate but prospectively, it is plain to be seen, that since it cannot affect anterior appropriations; and since it is equally plain that future acts of that sort, have a constitutional lease of life, for but two years, (when new appropriations must occur), it seems quite evident that the words, " continuing or reviving an appropriation," would be devoid of meaning. If, on the other hand, we construe the section as operating not only as to future, but also as to current appropriations, no obstacle obstructs the plain pathway of construction; for then, we apply the words, " new appropriation " prospectively, and the words, " continuing or reviving an appropriation," to those acts found in being by the constitution on its adoption, and which the framers of that instrument were evidently desirous of reducing to the same fundamental and uniform standard, as that confessedly applicable to subsequently enacted acts of appropriation.

And, it is evident to even casual observation, that the framers of the present constitution designed to imbed therein, as the central and controlling idea, the frugal administration of the financial resources of the State. Tak-

ing this obviously correct view of their design, it is inconceivable that they would so sedulously guard the treasury against future extravagance, and yet leave open the flood gates of former reckless expenditure; leave to be corrected by future, temporary and optional legislation, evils imperiously demanding permanent and fundamental correction. Such a construction, would, indeed render the clause in question, "lifeless," for, if current appropriations were not embraced by the constitution, then they would (unless meeting with legislative repeal) be perpetual.

We cannot believe that matters so necessary to the financial welfare of the State, so essential to the harmonious operation of the organic law, would be left by the makers of that law, dependent on the uncertainties incident to future legislation. The same view as here expressed was taken by us as to another clause of the constitution, accomplishing the immediate repeal of a repugnant statute, in *ex parte Snyder*, (64 Mo. 58). There is no warrant for the assertion that there is a "striking resemblance" between the 1st section of the schedule and section 3 of Art. 11, of the old constitution; for there is no provision in the latter section, as in the former, that "the provisions of all laws which are inconsistent with this constitution, shall cease upon its adoption."

Again, the Legislature, by section 18 of the general appropriation act of April, 1877, already referred to, repealed all annual appropriations. This would clearly cut off any right which relator might, in any event, possess under any former appropriation act. It is not our province to pass upon matters of mere moral right; but if legislative attention should be called to the matter, the Legislature might, perhaps, feel morally impelled to save those harmless, who, on the faith of former appropriations, have incurred personal responsibilities.

It is claimed by relator that as the act of April 6th, 1877, set apart $7,500 as an appropriation in favor of rela-

tor, the payment of $5,000 by respondent in the preceding January, was without authority of law, and therefore, relator may compel the payment of the whole $7,500 ; and, in support of this assumption, we are cited to *Treadwell v. Moore*, (34 Me. 115) where it is held that if a creditor holds two demands, one legal and the other illegal, against his debtor, and the latter makes a payment without designation as to which debt it shall be applied, then, the creditor may appropriate the payment to the illegal demand. But here, the relator does not occupy the attitude of creditor, nor the respondent, or the State, that of debtor. This is proven by the fact that the Legislature may at any time repeal the appropriation. The fiscal year commences with the month of January of each year. It was conceded in argument that it has been the custom to anticipate appropriations, by drawing warrants in the beginning of the fiscal year, and to treat appropriations subsequently made by the Legislature for the purpose for which the warrants were drawn, as covering the whole period of the fiscal year. Whether this practice, which it seems has prevailed for a long period unquestioned, is strictly regular, we need not determine ; but we do determine that it does not lie in the mouth of relator, after receiving beforehand the $5,000, to now impeach and hold for naught that payment. He is only entitled to the sum which the Auditor offers to pay him, and we shall deny the peremptory writ. All concur.

PEREMTORY WRIT DENIED.